**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| DARDEN DIRECT DISTRIBUTION, INC., <br><br> Plaintiff, <br><br> v. <br><br> QUALITY CUSTOM DISTRIBUTION SERVICES, LLC, f/k/a QUALITY CUSTOM DISTRIBUTION SERVICES, INC., <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: __________ |

**<u>COMPLAINT</u>**

Plaintiff, Darden Direct Distribution, Inc. ("DDDI" or "Darden"), by and through undersigned counsel, for its Complaint against Defendant Quality Custom Distribution Services, LLC, formerly known as Quality Custom Distribution Services, Inc. ("QCD"), alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. This is an action for breach of contract, anticipatory breach, and breach of the implied covenant of good faith and fair dealing arising out of QCD's efforts to force Darden out of a long-term distribution relationship years before the parties' agreement was set to expire.

2. DDDI and QCD are parties to a Distribution Agreement dated February 29, 2024 (the "Agreement"), under which QCD orders, pays for using Darden's account, warehouses, and distributes food, beverage, and other supplies to restaurants operated by DDDI affiliates from QCD's distribution center in Pineville, North Carolina (the "Pineville DC"). The Agreement runs through May 31, 2029, sets a fixed per-case distribution fee, and does not permit QCD to raise that fee unilaterally or to terminate the Agreement because it finds the relationship unprofitable or inconvenient.

3. Beginning in October 2025, QCD nonetheless demanded a unilateral, above-contract fee increase, threatened to end the relationship if Darden refused, intentionally deteriorated its already poor performance, invoiced Darden for fees exceeding the contractual rate, and ultimately served a purported notice that it would cease service and force Darden out of the Pineville DC by July 31, 2026—all in direct contravention of the Agreement.

4. The Agreement has not been terminated in accordance with its terms and remains in full force and effect.

5. Only DDDI, not QCD, holds the limited termination rights QCD has purported to exercise.

6. As a direct and foreseeable result of QCD's intentional misconduct, Darden has been forced to incur substantial extra-contractual costs to secure alternative distribution and avoid catastrophic and irreparable disruption to Darden's supply chain.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. This Court has specific personal jurisdiction over QCD pursuant to section 48.193(1)(a) of the Florida Statutes. QCD entered into a multi-year agreement with DDDI, a Florida corporation headquartered in this District, to provide distribution services to DDDI-affiliated restaurants through May 31, 2029. QCD expressly agreed that Florida law would govern the Agreement. QCD also maintains a network of operations in Florida, including a distribution center in Orlando, which was a factor in Darden's decision to enter into the Agreement. QCD further directed communications and demands to Darden in Florida that are central to the claims alleged and invoiced and collected payments from Darden in Florida. Through these activities, QCD purposefully availed itself of the privilege of conducting business in Florida in connection with the transactions at issue.

9. The Court also has general personal jurisdiction over QCD pursuant to section 48.193(2) of the Florida Statutes because QCD is engaged in substantial and not isolated activity within Florida.

10. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district, including QCD's demands directed to Darden at its headquarters in Orlando, Florida, the parties' negotiations, and Darden's payments to QCD. Venue is also

proper in this district under 28 U.S.C. § 1391(b)(1) and (c)(2), as QCD resides in this district.

## PARTIES

11. Plaintiff DDDI is a corporation incorporated under the laws of the State of Florida with its principal place of business at 1000 Darden Center Drive, Orlando, Florida 32837. Accordingly, DDDI is a citizen of Florida.

12. DDDI is the Darden entity that entered into the Agreement with QCD.

13. Upon information and belief, Defendant QCD is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 18301 Von Karman Avenue, Suite 1100, Irvine, CA 92612. Upon information and belief, QCD's sole member is Golden State Foods LLC, a Delaware limited liability company with a principal place of business in California. Upon information and belief, the sole member of Golden State Foods LLC is Endeavour Intermediate LLC. Upon information and belief, Endeavour Intermediate LLC's sole member is Goldberg Lindsay & Co. LLC. Upon information and belief, the members of Goldberg Lindsay & Co. LLC are Alan Goldberg and Robert Lindsay, who are citizens of New York. Accordingly, upon information and belief, QCD is a citizen of New York.

14. QCD is engaged in the business of purchasing, warehousing, and distributing food, beverage, and other products to restaurants and other customers. QCD operates numerous distribution centers across the country, including in Orlando, Florida.

## FACTUAL ALLEGATIONS

### A. The Distribution Agreement

15. DDDI and its affiliates and subsidiaries support the operation of one of the largest full-service restaurant portfolios in the United States, comprising multiple restaurant brands. DDDI and those restaurants depend on a reliable, uninterrupted supply of food and other products delivered through its distribution network.

16. DDDI relies on distributors such as QCD to purchase inventory in DDDI's name, warehouse it, and deliver it to restaurants. DDDI pays its distributors substantial per-case distribution fees each month.

17. On or about February 29, 2024, DDDI and QCD entered into the Agreement, a true and complete copy of which is attached as **Exhibit 1**.[1] Under the Agreement, QCD is required to purchase, warehouse, and distribute food, beverage, and other supplies to certain restaurants (the "Restaurants") from the Pineville DC.

18. The Agreement commenced on May 27, 2024 and, unless terminated in accordance with its terms, continues through May 31, 2029 (the "Term"). *See* Ex. 1 at § 2.1.

19. The Agreement sets the per-case distribution fee (the "Distribution Fee"). *Id.* at §7.1 and Sch. 2. Schedule 2 provides: "After June 1, 2025, the Parties will meet to mutually agree upon a schedule setting forth the annual Distribution Fees for the remainder of the Term. If the Parties fail to mutually agree in writing upon such

[1] A redacted copy of the Agreement is attached hereto. Plaintiff will file a Motion to Seal an unredacted copy of the Agreement pursuant to Local Rule 1.11.

schedule within sixty (60) days after May 31, 2025, the annual Distribution Fee shall remain [the same] per case and DDDI shall have the right to terminate this Agreement upon delivery of written notice to QCD." *Id.* at Sch. 2. The Agreement contains no provision permitting QCD to increase the Distribution Fee unilaterally.

20. Section 13.5 of the Agreement provides that any review of the Distribution Fee is limited to the first year of the Agreement and "shall not be an ongoing annual review." *Id.* at § 13.5.

21. Outside the agreed Distribution Fee, DDDI has no further financial liability to QCD. *Id.* at Sch. 2.

22. The Agreement strictly limits QCD's ability to terminate before the end of the Term.

23. QCD may terminate the Agreement early only if DDDI fails to pay undisputed amounts owed or breaches a material term and fails to cure within the applicable cure period, or upon specified insolvency or bankruptcy events affecting DDDI. *Id.* at §§13.2 and 13.4.

24. Nothing in the Agreement permits QCD to terminate because it regards the relationship with DDDI as unprofitable or no longer desirable.

25. The Agreement further contemplates that DDDI must be able to continue operating out of the Pineville DC during a transition.

26. Section 3.3(c) provides that, following termination of QCD's underlying lease for the Pineville DC or DDDI's termination of the Agreement, DDDI has the right to a temporary license to access and use the Pineville DC for the receiving,

storage, warehousing, and distribution of DDDI's inventory consistent with past practice. *Id.* at § 3.3(c).

27. The Agreement expressly states that "the failure of…DDDI to insist on strict performance of any of the terms and conditions of this Agreement will not be deemed a waiver of the respective rights or remedies that…DDDI may have regarding that specific instance nor will it be deemed a waiver of any preceding or subsequent breach or default of the same or any other term or condition." *Id.* at § 16.7.

28. Pursuant to Section 9.4 of the Agreement, QCD agreed to "indemnify and hold harmless DDDI from and against any and all claims, losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or relating to any breach by it of its obligations under this Agreement." *Id.* at § 9.4.

29. The Agreement is governed by Florida law. *Id.* at §16.12.

**B. QCD Demands an Unauthorized Fee Increase and Threatens the Relationship**

30. In October 2025, QCD informed Darden that it no longer viewed the relationship as profitable and demanded an increase to the Distribution Fee.

31. On or about October 30, 2025, QCD presented Darden with three options: (i) Option A—an approximate 37% price increase per case effective November 3, 2025, with pricing revisited after six months; (ii) Option B—the same 37% price increase per case, coupled with a "mutually agreed termination strategy and timeline"; and (iii) Option C—pricing continuing at the agreed upon Distribution Fee,



88857736;1

but with QCD reducing or eliminating investments and services, coupled with a "mutually agreed termination strategy and timeline."

32. Each of QCD's three options required Darden either to pay a fee higher than the Distribution Fee, or to accept reductions in the services and investments QCD was already contractually obligated to provide, and each contemplated an early "wind-down" of the relationship, i.e., termination of the Agreement – termination that the Agreement does not authorize QCD to demand.

33. On or about November 4, 2025, Darden responded to QCD's extortionate demand. Darden advised QCD that the Agreement sets the Distribution Fee, does not permit QCD to increase that fee unilaterally under threat of an impermissible early termination, and does not permit QCD to reduce or eliminate its obligations under the Agreement.

34. In the spirit of preserving the relationship and continuity of services to its restaurants and to mitigate the irreparable harm QCD's demand threatened, Darden informed QCD it would, effective December 1, 2025, pay an amount approximately 27% greater than the Distribution Fee, with the 27% increase per-case above the contractual case fee (the "Case Fee Premium") to be paid under protest, subject to monthly financial reviews and QCD's continued performance. Darden expressly reserved its rights.

35. On or about November 6, 2025, QCD rejected Darden's position.

36. QCD asserted that its proposed price increase was "reasonable and contractually justified" and "not a unilateral act," but a step necessary "to preserve the commercial balance contemplated by the Agreement."

37. QCD cited no provision of the Agreement authorizing the increase, because none exists.

38. QCD further stated that it would accept the 27% increase per case only through December 31, 2025, and would thereafter bill Darden at the higher, 37% increase per case through March 30, 2026, and announced that it would "work collaboratively toward an amicable transition and an orderly wind-down of the relationship."

39. Again, on March 2, 2026, QCD attempted to unilaterally increase the Distribution Fee due under the Agreement, demanding that DDDI pay an approximate 47% increase effective March 1, 2026.

40. By arbitrarily demanding fees and terms not required by the Agreement and coupling those demands with a stated intention to wind down the relationship, QCD repudiated the Agreement and made clear its refusal to perform for the balance of the Term on the terms to which it had agreed.

41. Beginning in approximately December 2025, QCD invoiced Darden for Case Fee Premiums above the Distribution Fee.

42. Darden paid these Case Fee Premiums under protest as part of its effort to preserve continuity of supply and mitigate the harm threatened by QCD's conduct, and expressly reserves its right to recover all such extra-contractual payments.

### C. QCD Degrades Its Performance and Pressures Darden to Vacate Space

43. Even as it increased the amounts it charged Darden, QCD pressured Darden to reduce the volume of restaurants served out of the Pineville DC.

44. At QCD's insistence and in response to threats to leave Darden with a gap in its supply chain if it did not comply, Darden reduced the Restaurants served by QCD by approximately 25%, including relocating all of the Cheddar's Scratch Kitchen restaurants previously served from the Pineville DC to free space for QCD.

45. QCD's demands were driven in part by QCD's desire to accommodate another occupant of the Pineville facility and to repurpose the space QCD had committed to Darden.

46. QCD deliberately allowed its performance under the Agreement to deteriorate in order to pressure Darden into agreeing to higher fees and an early termination of the relationship.

47. In fact, QCD personnel and/or agents informed Darden employees that QCD was intentionally underperforming to force Darden to end the relationship.

48. QCD's performance failures were especially severe during critical high-volume periods, including the Christmas, Valentine's Day, and Mother's Day holidays, and included late deliveries, understaffing and failure to cover staffing during vacations, transportation delays, mispicks, delayed invoicing, and failures to maintain and accurately track inventory. These failures constitute breaches of QCD's obligations under the Agreement, including its obligations governing inventory

ordering, shortage notification, delivery notification, and re-deliveries. *See* Ex. 1 at §§ 4.3, 4.7, 6.1(a), 6.2(e).

**D. QCD's Purported Accelerated Termination**

49. On or about May 20, 2026, QCD sent Darden a "Notice of Accelerated Transition of Services." In it, QCD informed Darden of its intention to cease performance under the Agreement and to oust Darden from the Pineville DC, effective July 31, 2026, citing "operational strain" and its own determination that continued performance was no longer "operationally feasible."

50. QCD's purported "accelerated transition" is a willful, material breach of the Agreement. None of the limited circumstances under which QCD may terminate early were present, and the Agreement does not permit QCD to end the relationship because it has concluded that continued performance is unprofitable or inconvenient.

51. The Agreement has not been terminated in accordance with its terms and remains in full force and effect through May 31, 2029.

52. Because QCD's distribution services are critical to the Restaurants and cannot be replaced overnight given that an immense volume of perishable and temperature-controlled inventory cannot simply be moved to another warehouse without extensive planning, execution, and expense, QCD's repudiation and threatened cessation of service exposed Darden to catastrophic and irreparable harm to Darden, the Restaurants' employees, and the surrounding communities, including the closure of approximately 120 Restaurants and the loss of more than ten thousand jobs.

53. To comply with its obligation to mitigate that irreparable harm and monetary damages, Darden was forced to undertake extraordinary and costly measures it had never before employed in order to maintain continuity of supply to the Restaurants. These efforts included Darden's affiliated entity leasing and standing up its own distribution center in Rock Hill, South Carolina, and engaging a different distributor to service the Restaurants from that facility. Preparing a building to become a distribution center, including negotiating terms, installing racks, finding trucks, and bringing the facility to required temperature, takes time, and the replacement will not be fully operational until approximately Fall 2026 at best.

54. Darden has incurred additional extraordinary costs, including engaging third-party providers and renting trucks to cover deliveries QCD failed to make.

55. As a direct and foreseeable result of QCD's intentional misconduct, Darden has been damaged, including through the difference between what Darden would have paid QCD under the Agreement and the higher overall cost Darden must pay under its affiliate entity's new distributor relationship and to establish and operate the replacement distribution center for the remainder of the Term, together with other incidental and consequential costs incurred to mitigate its damages.

56. All conditions precedent to bringing these claims, if any, have been performed, have occurred, or have been waived.

57. Darden has retained the undersigned attorneys to represent its interests in this litigation and is obligated to pay a reasonable fee for their services.

**COUNT I**
**Breach of Contract**

58. DDDI repeats and realleges paragraphs 1 through 57 as if fully set forth herein.

59. The Agreement is a valid and enforceable contract between DDDI and QCD.

60. QCD has materially breached the Agreement by, among other things: (a) demanding and imposing a fee above the Distribution Fee, which the Agreement does not permit QCD to do unilaterally; (b) invoicing and collecting Case Fee Premiums above the contractual rate; (c) failing to perform the distribution services required by the Agreement, including through late deliveries, mispicks, shortages, understaffing, and inadequate recoveries; and (d) purporting to terminate the Agreement and cease service before the end of the Term when no contractual basis for termination exists.

61. QCD further anticipatorily breached and repudiated the Agreement. QCD did so by demanding above-contract fees and terms and announcing a "wind-down" and accelerated termination that the Agreement does not permit.

62. DDDI was ready, willing, and able to perform its obligations under the Agreement and would have continued to perform through the end of the Term but for QCD's breaches and repudiation.

63. As a direct and proximate result of QCD's breaches, DDDI has suffered damages in an amount to be determined at trial, but in no event less than $75,000, plus interest and costs.

## COUNT II
## Breach of the Implied Covenant of Good Faith and Fair Dealing

64. DDDI repeats and realleges paragraphs 1 through 57 as if fully set forth herein.

65. Florida law recognizes an implied covenant of good faith and fair dealing in every contract, which protects the reasonable expectations of the contracting parties in light of their express agreement.

66. This claim is tied to, and accompanies, DDDI's claim that QCD breached the express terms of the Agreement, including the Distribution Fee, performance, and termination provisions.

67. QCD breached the implied covenant by, among other things, deliberately degrading its performance under the Agreement in order to coerce Darden into paying above-contract fees and accepting an early termination; using its control of the Pineville DC and its position in Darden's supply chain to extract concessions the Agreement does not require; and manufacturing a pretextual basis to abandon the relationship—all in a manner that frustrated Darden's reasonable expectations and deprived Darden of the benefit of its bargain.

68. As a direct and proximate result of QCD's breach of the implied covenant, DDDI has suffered damages in an amount to be determined at trial, but in no event less than $75,000, plus interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Darden Direct Distribution, Inc., respectfully requests that the Court enter judgment in its favor and against Defendant Quality Custom Distribution Services, LLC, awarding Darden its compensatory, actual, incidental, and consequential damages in an amount to be determined at trial, but in no event less than $75,000, plus attorneys' fees, pre- and post-judgment interest, and costs, and granting Darden such other and further relief as the Court deems just and proper.

## TRIAL BY JURY

Darden requests a trial by jury on all issues so triable.

Dated: October 13, 2026

Respectfully submitted,

**AKERMAN LLP**

*/s/Riya Resheidat*

MEGAN COSTA DELEON (Lead Counsel)
Florida Bar No. 0560731
RIYA RESHEIDAT
Florida Bar No. 124819
megan.deleon@akerman.com
riya.resheidat@akerman.com
wanda.thomas@akerman.com
kathie.merlo@akerman.com
420 South Orange Avenue, Suite 1200
Orlando, FL 32801-4904
Phone: (407) 423-4000
Fax: (407) 843-6610

and

AMY ERRICHIELLO (*pro hac vice* forthcoming)
amy.errichiello@akerman.com
101 South Tryon Street, Suite 1910
Charlotte, NC 28280
Phone: (336) 296-7126

*Attorneys for Plaintiff*